Thank you very much. All right. Appeal 16-1520, United States of America v. William Campbell. And it's Ms. Fox. Good morning. May it please the Court. Good morning. Kathleen Fox on behalf of Petitioner William Campbell. The key issue in this case is whether the government failed to meet its burden to prove that William Campbell acted with the required intent to defraud to sustain his convictions for wire fraud and misuse of an access device. It is clear in this case that they did not meet that burden. The charging documents allege a broad, multi-step scheme to defraud credit card holders. First, unnamed individuals stole credit card numbers. Second, those stolen credit card numbers were embossed on fake cards. Third, those bogus cards were used to buy Walmart gift cards. Fourth, those gift cards were then distributed to other individuals who then used those gift cards to buy products. Presumably, those products were then resold to benefit the members of the scheme. Now, the problem is that with respect to William Campbell, the government presented no competent evidence connecting Campbell with steps one through four of that scheme or that he benefited in any way from this alleged scheme. Not only did he not participate in those actions, but there's no evidence in the record that he was aware of them. Is it really far-fetched for a jury to conclude that Campbell was selling cigarettes to local convenience stores when he was buying thousands and thousands of cigarettes, far too many for personal consumption, and then was seen unloading them at a convenience store in Chicago? Is it really so far-fetched? No, Your Honor, I don't think it's far-fetched for a jury to conclude that Campbell was engaged in the resale of cigarettes, but that's not the scheme that's alleged here. Whether the business that he might have believed he was involved in with Mr. Jeffries to resale cigarettes was done according to state regulation or not is a completely distinct question from whether he's guilty of wire fraud and was acting knowingly in a scheme to defraud credit card holders. The evidence presented at trial showed that Campbell participated in a series of legal actions. He opened a Sam's Club membership using his Valor driver's license. He frequently shopped at a Sam's Club in Addison, Illinois, where he used Walmart gift cards to buy cigarettes in bulk. In and of themselves, there's nothing illegal in these actions. The question is one of intent. Now, the government raises two key arguments that they believe were sufficient to show intent. First, the odd nature of the transactions that Campbell must have known something was bad. In support of this common sense argument, the government, in closing, suggested he must have known there was no gift card fairy that just magically made these gift cards appear. The problem here is that that is not enough. As this court has articulated in United States v. Bailey, mere knowledge of shadowy dealings is not enough to sustain a conviction for this specific intent offense. This was $120,000 worth of fraudulent gift cards, right? Correct. More than 1,000 of them? More than 1,000, yes. Okay. Does quantity become relevant in that evaluation? I do believe quantity is a relevant factor to consider, but in this case, the quantity of the gift cards is equally as consistent with an inference that he was buying gift cards at a discount and then reselling cigarettes that were bought with those gift cards. There's nothing from the quantity of the gift cards in and of themselves. Wait a minute. Are you alleging a different crime? No, Your Honor, I'm not. What I'm saying here is that the inferences that can be drawn from the behavior are consistent with a business operation, and we have no evidence in the record whether that business would have been done exactly to the letter. And that's an equal inference one can draw as the one alleged by the government. Did Mr. Campbell testify? He did not. The key point here, though, is that it was not Campbell's duty, either at trial or here on appeal, to give an innocent inference for his actions. The question is whether the government met their burden. And as the case law in this court has indicated, when the same facts can draw an inference of behavior that is not consistent with guilt for the charged offense, the conviction cannot stand. Now, the second key argument that the government alleged— Let me just ask you, just I'm curious, was there any testimony about how much a gift card, how much money could be put on a gift card? Did it max out at $100, and that's why they kept doing it at $90? No, there was no testimony about why the value would have been $90, just that it was $90 over and over again. Right, $90 was the magic number. I understand that with the 12,000 cards. Correct. I just wondered what was magical about $90, whether there was some limitation. I don't know that there was anything magical about $90, and likely neither did Mr. Campbell, because he was not involved at all in the purchase of those gift cards, just their ultimate use. The second key argument raised by the government to support that Mr. Campbell must have acted with the requisite intent is his association with Ike Jeffries. Ike Jeffries is referred to by the government's witness as a more important player among those people whose accounts had activities at Sam's Club in this scheme, and that's a vast understatement. As compared to the evidence against Mr. Campbell, the evidence presented at trial connected with Jeffries goes far further. Well, but, you know, I mean, what you have here is an allegation of a scheme to defraud, and why wouldn't the jury be entitled to hear about Jeffries, you know, as a co-conspirator and Jeffries' role in this scheme and the theory about how the gift cards came to be? Why not? A couple of points there, Your Honor. First, a conspiracy charge was not alleged here, so the same evidentiary standards that would apply to law evidence of a co-conspirator's activities would not be the case here. Secondly, the question here is not whether the evidence is relevant regarding Mr. Jeffries' activities, but whether it was used to suggest a transferred intent from Mr. Jeffries to William Campbell. The government has to prove that Mr. Campbell, not Mr. Jeffries, acted with the requisite intent. And in this case, the clear argument that the jury used to find intent was that the evidence presented suggests that Mr. Jeffries has that intent, and therefore Mr. Campbell has as well. And there are a couple of reasons why this is not enough. First... Well, there's more, you know. For instance, I know in the brief you argued that the only connection between Campbell and Jeffries was that they purchased cigarettes while standing next to each other, you know, different. But wasn't there also evidence that they traveled together to Chicago and together unloaded cigarettes into that convenience store? Well, there was evidence of one day's shopping trip that was put forth that they came together to the store and then left as well. But the evidence in the record also shows that Mr. Campbell bought cigarettes 44 times at Sam's Club and was only there with Mr. Jeffries eight times. So they were clearly not acting together in every case. Wait, only eight times? Only eight times. So less than one-fifth of the times that he was purchasing cigarettes at Sam's Club. Now, we're not suggesting that the two individuals did not know each other, but the question is what Mr. Campbell's knowledge was over the overall scheme to defraud. And the interactions that he had with Mr. Jeffries did not supply us with any more information other than that he was using skip cards to purchase cigarettes at Sam's Club. Now, by contrast, the evidence presented with respect to Mr. Jeffries goes much further. Ten months after the end of the transactions that Mr. Campbell was involved with, a Secret Service agent executed valid warrants and searched Mr. Jeffries' residences. At that time, he found a decent amount of evidence that was suggestive of Mr. Jeffries' implication in the scheme. He found embossing machines. He found a laptop that allegedly contained emails discussing credit card fraud. He found Western Union receipts showing transfers of money from the United States to Russia. None of this evidence was connected with William Campbell. There's no evidence of the record that Mr. Campbell was ever at Mr. Jeffries' residences. There's no evidence that he participated in any of the Western Union activities, and no evidence that a single email on that laptop had any connection to Mr. Campbell. Further, Special Agent Boskoski testified that the reason he was familiar with Mr. Jeffries was that he had interviewed him after several other arrests, clearly portraying to the jury that this is a bad guy. The clear implication and inference the jury then drew was that Mr. Campbell's association with Jeffries, who seemed to have the requisite intent, supplied that for Mr. Campbell. Now the problem here is the repeated leaps that the jury has to make to find this intent. Of course, circumstantial evidence can provide evidence of intent. We can't get in any defendant's mind. But there must be more than mere speculation. It has to be a reasonable inference. And in this case, there is not. Be sure and save time. So just to briefly finish that point, and then I'll save my time for rebuttal. As I mentioned earlier, the speculation as to a defendant's intent cannot sustain the conviction where the facts suggest another explanation for that behavior. And the explanation does not have to be that Mr. Campbell is perfectly innocent. But in this case, it is suggestive of completely legal activity. The other explanation is that he was an eBay devotee who went online to buy lots of discounted? Possibly. It's an equal inference that can be drawn from these same facts. There are websites that sell gift cards at a discount. Those could be bought in bulk, then re-buy cigarettes at a store that also provides a discount for bulk, and then re-sell them. Thank you. Thank you. Okay. Mr. Zuer. May it please the Court, Paul Zuer for the United States. The government absolutely introduced sufficient evidence to prove the defendant, William Campbell's guilt in this case. And the defendant continues to misconceptualize what it was that the defendant's role was in this case. The defendant's role was the downstream person responsible for effectively monetizing, converting to cash these gift cards that the other co-schemers in the case obtained through the fraud. And he did that by buying huge quantities of cigarettes with his co-schemer, Ike Jeffries, and together delivering those cigarettes to a convenience store. And sufficient evidence absolutely proved the defendant's knowing participation in the scheme. As Your Honor has noted, there was testimony in Wal-Mart records and videos establishing that the defendant repeatedly over a seven-month period went to the same Addison Sam's Club. What does that have to do with anything? I cannot for the life of me figure out why it matters if he went to the same one or if he went to ten different ones. What does it matter? It's a pattern, Your Honor. A pattern of what? Of repeated dealing and the fact that he's going to a store many miles away from his home. So? Maybe he wouldn't have lunch there. I mean, really? Well, no. And Your Honor has to understand, the argument that's being presented to this court here is very different than the argument that was presented in the court below. The argument that Mr. Campbell presented in the court below is one of identity. He was arguing almost entirely in the court below that almost conceding the existence of a scheme, but that he was not the person who was committing the scheme. And so all this evidence that came in regarding where he was shopping, the government was introducing it and using it to show that he was trying to distance himself from being the person who actually was involved in the crime. What is your best evidence that Campbell had knowledge that the gift cards were purchased with stolen credit cards? What's the best evidence of that? Three pieces of evidence, Your Honor. One is the 20-minute video that the jury saw from December 7, 2010, I believe it was, when Jeffries and Campbell— Are unloading. Were—actually, several things. Even before the unloading, were at the sales counter together at that Addison store buying cigarettes. And it's not just the two of them independently. They are interacting with each other nonstop during that video, and you can see each other sharing gift cards. There's also Walmart and Sam's Club records that show that the timing, the second piece of evidence showed the timing of the use of the gift cards as compared vis-à-vis the purchase of those gift cards. So focusing on December 7, the government argued in closing that all these gift cards were used within a day or two of their purchase. I went back in preparation for this argument and looked at the purchase of the gift cards used by Campbell and Jeffries on December 7. With one exception for Campbell, they were all purchased in the afternoon and late into the evening the night before on December 6, just the night before. So within 12 hours of their purchase, Campbell is at the Sam's Club store using gift cards. So no time for an eBay exchange. Exactly, Your Honor. There's nothing in the record that suggests any other source for these cards. Even more so, Your Honor, the same batch of gift cards that were purchased in Walmart stores late in the evening on December 6, Ike Jeffries used additional of those same set of cards that same day on December 7 when he and Campbell are at the store as seen on the video. What was the evidence regarding the nature of the relationship between the two? I mean, was there evidence of their interactions other than the fact that they went to Sam's Club together? Sort of, Your Honor. It's more than just the mere fact that they were there the eight times. The video, again, I come back to again and again. It does show a very close relationship between the two. It doesn't show two independent buyers acting independently, acting as if they don't actually know each other. They are there together. And the videos also show them drive to the store together, walk through the store together, put the cigarettes that they've jointly purchased that day into the same shopping cart and exit the store together, then unload those cigarettes from the shopping cart into the same car and drive away together. We also have the testimony and photographic evidence from the Walmart investigator who conducted surveillance on that car after they left on December 7 and show them together unloading those cigarettes at the store. So when you have that day in detail and you combine that with the other seven instances that they were together and you combine that with just the simple fact that both of these individuals were committing the same conduct again and again and again over the exact same period of time, there was a strong difference that the jury could reach about their relationship, about how closely they worked together. Is it the government's contention that this is sort of an unsuccessful ostrich defense by Campbell? In other words, could a reasonable person be given $101,000 worth of gift cards and not understand that they were not from a legitimate source and that therefore he had to have had the intent, you know, to defraud? No, because again, that's just one piece of the evidence. To be sure, that is an important piece of the government's evidence. It's $101,000 of cigarette purchases over a very short period of time, seven months. It's repeated trips to the same Sam's Club store. And I do bring you back at this point to the question you asked about why it matters. He's going almost daily to Sam's Club, and he's essentially wasting all this time driving way out 20 miles in each direction  I know people who drive miles and miles to some outlet store five days a week. Absolutely, but there aren't similar or identical outlet stores closer to their homes, and that's the significant piece that was also introduced to the jury. How do we know what's near their homes? Well, we know what was near the home in this case. Government exhibit map one showed exactly where Mr. Campbell resided and showed all the other Sam's Club stores in the vicinity. I'm never going to get it. I'm never going to understand. I'm never going to understand why it makes a difference. Now I'm going to be afraid to go to the same Trader Joe's, and you've done this to me. My apologies, Your Honor. Now, of course, you're not using $1290 gift cards again and again and again. I'm not. You're certain of that? I'm making a safe assumption there, yes, Your Honor. I'll take judicial notice. And it is. It is that use. It's not just 1,200 gift cards. It's also the fact that it is over 1,000 gift cards valued at exactly $90. Your Honor, Judge Williams, you asked earlier about the significance of the $90. We didn't introduce it at this trial, but we did have some evidence for some of the other co-defendants in this case about exactly where that $90 came from. There was talk among the organization that $100 or more on a gift card triggered Walmart inspection of the purchase of the gift card. By the way, since you mentioned all those others, why didn't any of them, including Jeffries, testify against Campbell? We asked. We actually thought that Jeffries was going to testify against Campbell, and he chose at relatively the last minute not to. And, in fact, it was so late in the day that he chose not to. If you take a look at the docket, he actually pled guilty after the trial. So everyone assumed he was going to plead guilty, and, in fact, he did. But there was a whole issue surrounding whether or not Jeffries would testify. Mr. Zwer, I know we're subject to the plain error standard of review on the testimony about the search of Jeffries' home, but I've got to say I'm troubled by it just because of the long time delay. It was, what, about 10 months after Mr. Campbell's last purchase that was part of the evidence? It just seems to me like that information would be awfully stale at that point in an attempt to link it to Campbell. No, actually, I think the nature of what was found makes it less stale. And so what was found were email fragments on a laptop computer, a machine used to emboss credit cards. In fact, eight or so were counterfeit credit cards. Was that evidence? Was the evidence? I didn't see anything, though, in the testimony about that point that linked it to the relevant time periods. What does link it is the Sam's Club and Walmart record shown for Jeffries' use of credit cards, counterfeit credit cards and these gift cards, that shows that he was getting these cards and using gift cards in the exact same way that Campbell was at a time from before when Campbell started through a time after Campbell finished and up to that time right around the time when the search was executed. And this is equipment, Your Honor, and evidence that isn't of the kind that it's not drug evidence. It's not a package of narcotics where the nature of the item you would expect not to be there for very long. Well, but it's certainly easy to imagine that Jeffries could have been involved with a shifting cast of characters, and that's why the long time delay just seems troubling to me. Obviously, no objection was made, and none of these things were fleshed out as they might have been. But I'll just note my concern that that seems like a stretch to me. Sure, and I understand your concern. I also point out that it was far from the most compelling piece of evidence that the government put in, and we are operating under a plain error standard. That error is not plain. The other evidence, even absent the existence of that piece of evidence, would still have allowed the jury to reach a guilty verdict on this case. In other words, that shouldn't be the thing that ultimately requires this court to reverse the judgment. Did the government address the fact at trial that Mr. Campbell was apparently pretty open in terms of using his own identity and et cetera for these transactions? We did, and again, I come back to the idea that this was effectively an identity argument in the court below. There's conflict there just by nature. The point is that Campbell must not have been committing a fraud if he got this membership. That was argued to be nonsense because it was necessary for him to be able to shop at Sam's Club and commit this fraud that he get this membership ID. The reality is this scheme was occurring in stores much broader than Sam's Club and Walmart, and the unraveling of this organization came because they were doing exactly this. They used their memberships at Sam's Club in the way that Campbell did. That's how we identified all these defendants. The salient point, though, is that the fraud wasn't being committed on Sam's Club. The fraud was being committed on the holders of the cards, and there was nothing presented to the holders of the cards to suggest that they knew A, that their credit cards were being fraudulently misused, or B, the identity of the people who were misusing those cards. In other words, they concealed, these defendants, including Mr. Campbell, concealed their identities from the actual victims of this case and made no effort to identify themselves to the actual victims of this case. The fact that they were using a Sam's Club membership, I just simply don't think that they thought through the fact that there would be records that would come out of this connecting their use to their membership ID. Could I ask you one factual question? Of course. How much does Sam's Club sell a case of cigarettes for, and how big is a case? I know that's in the record. I can't remember offhand. I know it was the testimony of Ms. Agakani, I believe. A case, I believe, is something like 40 cartons or maybe 20 cartons, maybe half that. You can see it in government exhibit, I'm sorry, docket entry 369-3 contains still images of that video that I keep talking about, and the video is itself in the record. And if you look at that docket entry, you can actually see the cases and the cartons. They filled one or two shopping carts on that one day alone where they bought collectively some $7,000 worth of cigarettes. They filled one to two shopping carts of cigarettes. What I've heard is thousands of dollars worth of cigarettes. Absolutely. In today's cigarette market. Thank you. I grew up in the 90s in South Carolina and North Carolina. You're young. Very different. Okay, thank you. Thank you, Your Honor. Unless this Court has any further questions about either the sufficiency point or either of the other two points that the defense raised, the government asks this Court to affirm the judgment and conviction below. Thank you. Thank you. Four minutes. Thank you. With my remaining time, I'd like to address a couple of the points raised by the government. The first is the suggestion that Mr. Campbell acted to conceal his identity. In fact, the details surrounding his transactions showed that Mr. Campbell, unlike other members of the alleged scheme, did not act to conceal his identity. As was mentioned earlier, he was- Was identity contested at trial? Yes, it was contested at trial. But the factual theory that the defense used to argue its case at trial has no bearing on whether the government needs to prove intent. And here, the details that were presented show that the way Mr. Campbell got his Sam's Club membership, using a valid ID, the fact that he went to the same location 44 times, one can certainly imagine that if someone were trying to hide a large volume of purchases, it would make a lot more sense to go to the area at Sam's Clubs, so that this wouldn't be quite as apparent. In fact, other of the alleged co-schemers in the original indictment allegedly opened their Sam's Club membership with fake IDs, showing again a disconnect between Mr. Campbell and the other members of the alleged scheme. To that, it's irrelevant whether the gift cards were purchased only the night or the day before, because there's no evidence in the record that Mr. Campbell had any participation in or any knowledge of their purchase. The only thing we can see from the record is the evidence of Mr. Campbell using the gift cards. Now, the government has suggested that they had a lot of evidence about the other members of the alleged scheme, and that's very clear from the way the case was presented at trial. But what there isn't evidence of is Campbell's knowledge of the other schemers and what his intent was. And in fact, we see that he's in a very different place from the other alleged members of this scheme. Unlike Mr. Jeffries, whose behavior and transactions continue over a very long period, for whom evidence was found in his home and seized, none of that evidence connects with Mr. Campbell. Further, the original indictment shows that expensive cars, a motorcycle, things were seized in forfeiture proceedings as part of this alleged scheme. None of that is suggested of Mr. Campbell. This raises our third argument on appeal as well, of the problem of the difference between the indictment that was presented to the jury and the evidence as to Mr. Campbell at trial. Now, the indictment presented a full roadmap of this robust scheme where co-schemers allegedly stole credit card numbers, then purchased gift cards, and then used them to resell. But Mr. Campbell, using the government's own terms, was the downstream player in this. And the question here is what he knew about what was going on upstream. And there is no evidence in the record that lets us infer that he had knowledge of the fraudulent nature of the scheme. In fact, the steps he took in doing these transactions, using his valid ID when other members of the scheme did not, continuing to go to the same location, suggests that he, unlike other members of the scheme, was not aware of the need to conceal his identity. The very fact that there was a separate purchaser, not the person who bought the gift cards in the first place, but to have to take another person into this scheme to buy the cigarettes, suggests that there's a disconnect between the core members of the scheme and Mr. Campbell. For all these reasons, the evidence presented at trial did not allow a reasonable jury to find that the government had met its burden to prove the specific intent of this fraud. Sorry. On that dramatic note. Sorry. Are there any further questions? Thank you. Thanks very much to both of you. Now, you were appointed, weren't you? Well, you certainly did a great job for your client. And the government always does a great job for its client. So, thank you. Case under advisement.